# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND D. HURT | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-13-747 |
| GREG FLURY, et al. | * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM OPINION

Pending are Defendants' Motions to Dismiss or for Summary Judgment (ECF Nos. 15, 39, and 48); Plaintiff's Cross-Motions for Summary Judgment (ECF Nos. 24, 43, and 53); and Plaintiff's Motions for Preliminary Injunction (ECF Nos. 9, 11, 34, and 44). All motions are opposed. A hearing in this matter is unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, judgment shall be entered in favor of all Defendants and injunctive relief denied.

## Background

Plaintiff Raymond D. Hurt is a prisoner incarcerated at North Branch Correctional Institution (NBCI) who alleges he is being denied appropriate medical treatment for a serious medical condition. Additionally, he claims correctional staff members are disposing of his mail, preventing him from exhausting administrative remedies and requiring him to re-route his mail through his mother's address in order to insure administrative appeals to the Commissioner of Correction are received. As relief he seeks an injunction requiring medical staff to perform tests to determine the nature of his illness; an injunction prohibiting correctional staff from interfering with his mail; and unspecified monetary damages. ECF No. 1 at p. 12.

Plaintiff states that between the months of August and November of 2012, while confined at NBCI, his weight dropped from 173 pounds to 151 pounds. He complained to Dr. Ottey and Dr. Merril that he was losing weight at "an alarming weight" and that he was experiencing a "foul odor emanating from the pores of his body" that occurred within approximately one hour after eating certain foods and taking certain medications. ECF No. 1 at p. 4. Plaintiff claims that medical personnel refused to order any testing other than for thyroid function, forcing him to initiate a hunger strike on December 1, 2012, which he announced would only be ended if he was sent to an outside hospital for blood and urine testing. Plaintiff's demands were not met, but he claims he was provided blood and urine tests from medical staff at Western Correctional Institution (WCI) in mid-December, 2012. Plaintiff claims the results of these tests have disappeared. *Id*.

On December 16, 2012, while housed at the WCI infirmary, Plaintiff fell down due to the malnutrition caused by his hunger strike. Plaintiff sustained a large "highly noticeable bruise" on the right side of his forehead as a result of his fall. *Id*. On December 19, 2012, Plaintiff alleges he was called into the medical unit by Dr. Merril, who administered "a four-way blood test coupled with urine test" for the purpose of locating "any foreign elements" in Plaintiff's system. *Id*. Plaintiff states the test was performed to determine if some sort of toxin was causing his symptoms of weight loss and foul body odor. He alleges that almost immediately after performing the test on Plaintiff, Dr. Merril quit his job at NBCI "due to being socially ostracized by a sector of medical personnel" because he provided the tests to Plaintiff. He further claims that the results of the tests performed by Merril have also disappeared.

On December 20, 2012, Plaintiff claims he had dropped to 128 pounds after going without food for 20 days and, as a result, he lost consciousness in his cell and also passed out in

the bathroom of an infirmary cell. Plaintiff claims he could not be revived with smelling salts and did not regain consciousness until one hour later when staff were preparing to transport him to the hospital. While at the hospital, Plaintiff claims he was denied tests for malnutrition and for detection of foreign elements in his blood or urine, but instead was given a CT scan for the bruise he sustained on his head four days prior to his arrival. Plaintiff attributes the failure to perform the tests he felt were necessary to the "deliberate indifference" of Dr. Schellhase,[1] who sent Plaintiff to the hospital from NBCI. The following day, Plaintiff ended his hunger strike because he feared he was facing certain death via malnutrition and that he would not receive hospital testing for toxins as he has hoped. ECF No. 1 at p. 5.

Plaintiff alleges he regained 17 pounds within one week of ending his hunger strike which he attributes to avoiding certain foods that caused his symptoms of weight loss and body odor. He claims, however, that by December 28, 2012, almost every food item that induced his symptoms was being served on the trays he received while housed in disciplinary segregation and he could no longer avoid the problematic food. Plaintiff alleges he began attempting to randomly select food trays from the food cart in order to avoid "tainted food items," but claims his ability to do so became severely limited, resulting in his weight fluctuating between 138 and 141 pounds. *Id*. Plaintiff claims that despite the missing test results, "Nurse Jamie," Ottey and Merril informed him on February 9 and 16, 2013, that no further tests would be ordered. *Id*.

On January 18, 2013, Plaintiff states that he pretended to pass out by "laying (sic) prostrate on his bed and acting unconscious" in an attempt to force staff at NBCI to send him to the hospital for proper testing or treatment. During his feigned unconsciousness Plaintiff states that officers banged on his cell door and called his name and that Nurse Kelly, who was on

---

[1] Dr. Schellhase's name is improperly spelled on the docket as Schelldince. The Clerk shall correct the docket to reflect the proper spelling of his name.

standby with Plaintiff's medication, failed to follow protocol when encountering an unconscious inmate. Plaintiff claims Kelly did not take his vital signs or attempt to revive him.[2] He further alleges that PA Flury, Dr. Ottey, and Director of Nursing Janice Gilmore continue to refuse to reorder medical testing to detect toxins. ECF No. 1 at pp. 5 – 6.

In addition to "certain food portions" causing his symptoms, Plaintiff claims that the Lithium he is administered by medical staff is also responsible. Plaintiff states that the only hope he has to obtain legitimate tests for toxins is to be transported to an outside hospital for the tests.[3] On February 8, 2013, Plaintiff again feigned losing consciousness and was transported to a hospital. Once there, Plaintiff claims that staff at NBCI communicated with hospital staff claiming Plaintiff had psychological issues and that his complaints regarding his symptoms as well as his requests for testing should not be taken seriously by hospital staff. Plaintiff claims that testing began at the hospital, but was abruptly cancelled by a doctor who pretended to be angry. Plaintiff asserts that the testing was cancelled due to pressure from prison personnel, but two tests were completed for blood sugar and electrolytes. ECF No. 1 at p. 6. Plaintiff admits Ottey has ordered blood and urine testing, but states the tests are "frivolous to the issue at hand." *Id*. at p. 7.

Plaintiff also claims that correctional staff has been deliberately indifferent to his serious medical need by dismissing his administrative remedy procedure complaints (ARPs) regarding the issue. He states Lt. Wilt and Warden Shearin's dismissals of his ARPs exhibit deliberate indifference and alleges his appeals of those dismissals to the Commissioner of Correction are

---

[2] Plaintiff maintains that Kelly did not know he was faking and acted with callous disregard for his health when she did not monitor his vital signs. He seeks one dollar in nominal damages against her for this alleged misconduct. ECF No. 1 at p. 5.

[3] Plaintiff claims he has mailed samples of the Lithium and the suspected food to an outside address so that it may be tested upon request of the court. ECF No. 1 at p. 6.

the result of mail "in all probability" being confiscated by NBCI officers. He asserts there is an ongoing problem with the loss or theft of outgoing mail from the institution and, based on that history, he did not attempt to exhaust administrative remedies before filing the instant complaint, believing he would put his health in jeopardy by doing so. ECF No. 1 at pp. 7 – 8.

## Preliminary Injunction

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, _U.S. _, 130 S.Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

In his multiple Motions for Preliminary Injunctive Relief[4] Plaintiff alleges an order requiring him to be transported to an outside hospital for medical testing is necessary in order to insure he is in fact tested and the true results are communicated to him. He claims the tests provided to him thus far either do not test for the appropriate substances or the results have been altered. Plaintiff further asserts that Defendants have too much to lose by providing him with the appropriate tests or the actual results. Defendants oppose each of Plaintiff's motions and incorporate by reference their Motion for Summary Judgment. As set forth more fully below, Plaintiff cannot succeed on the merits of his claim; therefore, his motions for injunctive relief shall be denied.

---

[4] *See* ECF Nos. 9, 11, 34, and 44.

**Standard of Review**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec*.

*Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

## <u>Analysis</u>

### <u>Medical Claim</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but

failed to either provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839- 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d at 390; *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Defendant Schellhase, a psychiatrist who was, at all times relevant to the Complaint, employed at NBCI, asserts he was not involved in any decision to deny the testing Plaintiff believes is required. ECF No. 15. In his affidavit Schellhase states he has treated Plaintiff for bipolar disorder and prescribed Lithium for this condition, but Plaintiff does not always take the medication as prescribed. *Id*. at Ex. 2, p. 1. Schellhase further states that he was asked to see

8

Plaintiff in the prison infirmary after one of his fainting episodes and, upon noticing a bruise on Plaintiff's forehead, recommended that Plaintiff be transported to the hospital for a CT scan. *Id*. at p. 2. He explains the purpose of the scan was to rule out an intracranial hemorrhage. *Id*. Schellhase also states that he did not ever attempt to dissuade anyone from ordering tests for Plaintiff, but is aware that multiple tests have been ordered and completed on multiple occasions by other medical professionals at NBCI, none of which reflected the presence of any metabolic abnormality or poisoning. *Id*.

In his Opposition Response Plaintiff asserts that Schellhase should have insured that blood and urine tests were performed by the hospital in order to identify the cause of his fainting episode. He disputes Schellhase's assertion that it was outside the scope of his duties to order those tests since he was asked to see Plaintiff for a medical evaluation. ECF No. 24 and 28.

Schellhase is entitled to judgment in his favor on the claims against him. A callous disregard for Plaintiff's health is not evident in the actions taken by Schellhase in light of Plaintiff's condition at the time he was seen. The decision to have a CT scan performed to insure Plaintiff did not sustain a serious head injury was one of emergent concern. Even if Schellhase improperly neglected to order other tests, that failure did not amount to deliberate indifference to a serious medical need, particularly in light of the fact that tests had been performed and revealed no abnormalities.

Defendants Meril, Ottey, Flury and Gilmore ("medical Defendants") allege Plaintiff has received constitutionally adequate medical care. Plaintiff's medical conditions include viral Hepatitis C as well as bipolar and antisocial personality disorders. ECF No. 39 at Ex. 2. To manage Plaintiff's hepatitis he is a chronic care patient, where he is regularly monitored and seen periodically by liver specialists. *Id*. Due to Plaintiff's psychiatric disorders, he experiences

episodes of compulsive behavior, mania, grandiose thoughts, paranoia, flights of ideas, poor insight, and poor judgment. *Id*. Although Plaintiff is seen by mental health professionals regularly, he is non-compliant with medication prescribed for his mood disorder (i.e., Lithium). *Id*. Because of Plaintiff's non-compliance with the psychotropic medication prescribed for him, he is not currently considered a candidate for Interferon treatment for his liver disease. Medical Defendants have explained to Plaintiff he must demonstrate at least six months of compliance and be assessed as psychologically stable in order for this status to change. Despite this knowledge, Plaintiff continues to refuse to take the medication provided. *Id*. at p. 3.

Plaintiff first reported his concerns with rapid weight loss on July 22, 2012, and shortly thereafter, Plaintiff was placed on a high calorie diet. *Id*. at p. 4. On October 28, 2012, Plaintiff reported that he had lost weight despite the high caloric diet and he was seen for this complaint on November 14, 2012 in the chronic care clinic. Plaintiff, who is 5'10" tall, weighed 156 pounds with a body mass index of 22.38, which is within normal range. At that time it was Dr. Ottey's medical opinion that Plaintiff's weight loss was most likely a symptom of his Hepatitis C condition. *Id*.

On November 15 and 17, 2012, Plaintiff reported that the diet he was on was making him sick and he was refusing certain meals. Based on that report, the high calorie diet was discontinued, but Plaintiff continued to complain that the food he was eating was making him ill. He reported a strange odor coming from his pores and that he was voiding grease. Plaintiff's November 28, 2012 assessment did not reveal any findings consistent with poisoning. *Id*.

On December 1, 2012, Plaintiff informed medical staff he was on a hunger strike. He was again assessed on December 3, 2012, but nothing was observed to support his claims of poisoning or that he was emitting a sulfur-like smell from his pores. During Plaintiff's hunger

10

strike his vital signs were checked on a daily basis and he was advised of the health risks associated with malnutrition and dehydration which could result from continuing with the strike. *Id*. at pp. 4 – 5.

Plaintiff was referred to a mental health professional for evaluation due to the lack of clinical support for his complaints. On December 5, 2012, he was seen by Vicky Varnick, LCSW, who concluded that Plaintiff's hunger strike was "goal oriented behavior" aimed at obtaining a transfer to an outside medical facility. A consensus was reached among medical and mental health providers that Plaintiff's complaints regarding poisoning were a result of his bipolar disease. *Id*. at p. 5.

Plaintiff remained on a hunger strike until December 21, 2012, and was admitted to the infirmary twice. During his hunger strike urinalysis and diagnostic lab work were completed on December 11 and 19, 2012, and the results of the tests were medically unremarkable. Plaintiff's weight dropped from 145.7 pounds to 129.8 pounds as a result of his hunger strike. When Plaintiff resumed eating his weight increased to 142 pounds as of December 23, 2012. *Id*.

On February 8, 2013, Plaintiff was found unresponsive and was sent to Western Medical Health Systems Emergency Department (WMHS) for evaluation. While at the hospital Plaintiff continued to complain he was being poisoned; however, lab work did not support his claims. He was discharged from the hospital to WCI's medical infirmary with a diagnosis of psychosis.[5] *Id*. at p. 6.

On February 9, 2013, Plaintiff was again evaluated by Dr. Ottey and continued to express his belief that he was being poisoned or given a weight loss toxin. At the time of the evaluation, Plaintiff weighed 144.8 pounds and no objective clinical findings were made to support his claim that he was being poisoned. Despite the lack of objective evidence, orders for a complete

---

[5] Plaintiff denies suffering from mental health issues. ECF No. 39 at Ex. 2, p. 7.

chemistry screen, HIV study, urinalysis, and thyroid panel were ordered as well as a weekly check of Plaintiff's vital signs. In addition, Plaintiff was referred to mental health staff for follow-up. The results of the tests were unremarkable except for Plaintiff's liver function values. *Id*.

On February 21, 2013, Plaintiff was seen by mental health provider Warnick because he was expressing suicidal thoughts. When asked about his threats of suicide, however, Plaintiff began talking about his beliefs that his food was being poisoned and that he was afraid to eat. During the evaluation Plaintiff admitted he was not suicidal, but became agitated and claimed other "non-white supremacists were out to get him." Plaintiff was assessed as exhibiting signs of hypomania. *Id*. at p. 6. After filing the instant Complaint in this court on March 8, 2013, Plaintiff ceased to voice any complaints regarding his food or being poisoned. When Plaintiff was seen by a mental health professional on April 24, 2013, he expressed concerns about housing, but none regarding his food. *Id*. at p. 7.

In his Cross-Motion for Summary Judgment Plaintiff asserts that he requires transfer to a public hospital for testing because medical Defendants are not providing him with non-fraudulent medical tests. He states that because he has sued the entire head of medical staff at NBCI they have no interest in providing tests which may prove his allegations are true. ECF No. 43 at p. 3. He further claims that the episodes of compulsive behavior, mania, paranoia, grandiose thought, flights of ideas, and poor insight and judgment have been "concocted" by medical Defendants and relies on a statement by Warnick that given his history of being assaulted, Plaintiff has reason to experience some paranoia. *Id*. at p. 4 and Ex. B. Plaintiff claims he is not regularly seen by mental health professionals, but is seen only once every six months for purposes of possible clearance for Interferon treatment for his Hepatitis C. ECF No.

43 at p. 4. He further denies he was placed on a high calorie diet and states he was instead put on a 2400 calorie per day diet which has no more calories per daily serving than the standard food tray. *Id*. at p. 4 and Ex. C. Plaintiff claims that the stated results of the tests medical Defendants provided are fraudulent if they were designed to detect the presence of weight loss supplements in the blood and urine. *Id*. at p. 4. He denies that his belief about being poisoned is the result of paranoia because his symptoms follow "ingestion of many non-randomly chosen food items . . . but . . . never follow his ingestion of randomly chosen food items." *Id*. at p. 5. Plaintiff asserts that this pattern is one that supports his conclusion he is being poisoned. *Id*.

Plaintiff claims that it is inaccurate to say he disagrees with his course of treatment because he has been provided no treatment, nor has he been provided a diagnosis. *Id*. at p. 8. Plaintiff also claims Defendants have misstated his claims and have deliberately attempted to mislead this court as to statements he has made to both medical and mental health staff.[6] *Id*. at pp. 8 – 10.

Where, as here, the treatment preferred by the prisoner Plaintiff is unsupported by objective, clinical evidence that the treatment or tests are medically necessary, an Eighth Amendment claim is not established. Plaintiff's deeply held belief that he is being poisoned and that all tests provided are fraudulent are simply unsupported by any objective evidence. Plaintiff's weight loss has been attributed by medically trained staff to both his Hepatitis C and his hunger strike. Plaintiff's weight loss and the other symptoms he reports which have not been clinically observed, does not require the elaborate medical testing Plaintiff demands, particularly in light of the fact that his weight loss is reasonably attributable to a known disease. *See e.g.*, ECF No. 39 at Ex. 1, p. 25 (listing among associated symptoms of hepatitis, "weight loss"). Despite the lack of objective findings supportive of Plaintiff's assertions he is being poisoned,

---

[6] Assuming Plaintiff's assertions are true, those disputes do not present a genuine dispute of material fact.

medical Defendants have continued to conduct tests, the results of which are unremarkable, and to monitor his vital signs as well as attempt to provide treatment for Plaintiff's mood disorder and Hepatitis. The conduct evidenced by the records submitted does not amount to a callous disregard for a serious medical condition. Finally, an Eighth Amendment violation is not established where diagnostic tests are declined based on medical assessments of the patient. *See Wright v. Collins*, 766 F.2d 841, 849(4th Cir. 1985) (disagreement with medical opinion is not deliberate indifference).

Claims Against Correctional Defendants

Plaintiff seeks to impose liability on Warden Shearin and Lt. Wilt, the Administrative Remedy Coordinator for NBCI, alleging they received his ARPs concerning his medical care but refused to take action and the appeals he filed of the ARPs never reached the intended destination of the Commissioner of Correction's office. Plaintiff claims Shearin and Wilt's refusal to take action on his claims he is not receiving proper medical care amounts to deliberate indifference to a serious medical need. Based on the analysis above, the claim regarding medical care as to Shearin and Wilt is without merit. Beyond actual knowledge, "an officer must also have 'recognized that his actions were insufficient' to mitigate the risk of harm to the inmate arising from his medical needs." *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008). The record does not support a finding that reasonable correctional officials in Correctional Defendants' place would have recognized Plaintiff's stated need for medical care. Thus, they are entitled to summary judgment in their favor.

With respect to Plaintiff's claim that his mail is intercepted making appeals of the ARP dismissals futile, Correctional Defendants state that from March 22, 2010 through June 12, 2013, Plaintiff has filed 88 ARPs which are typically voluminous and address more than one issue.

ECF No. 48 at Ex. A. Additionally, they explain that inmates at NBCI give ARPs to a tier officer and they are forwarded to the Officer in Charge, who then gives them to Wilt for processing. *Id*. Once the ARP reaches Wilt's office it is logged into an electronic database and assigned a case number. *Id*. The ARP is then assigned for investigation and, upon completion of the investigation, is returned with a recommendation for disposition and sent to the Warden's office for review. Once the Warden reviews the response and approves it, it is returned to the inmate who submitted it. *Id*.

Amanda Roberts, the ARP Appeal Coordinator for the Department of Public Safety and Correctional Services, states each appeal received in the office is logged in with the number assigned to the ARP as well as the inmate's name and identification number. *Id*. at Ex. B. Some appeals are returned to the submitting inmate with a letter explaining the reason for its return and what the inmate must do in order to resubmit it. *Id*. During 2012, Plaintiff submitted 29 appeals which were logged into the system and seven which were returned to him for resubmission. *Id*.

With regard to outgoing mail, Lt. Sean McKenzie, the housing unit manager where Plaintiff is assigned, states that outgoing mail is placed in a secure mail box located in the center hall of the housing unit and is collected by the 3 – 11 shift. *Id*. at Ex. C. The mail is then taken to the NBCI mail room where it is processed and sent out. *Id*. Correctional Defendants additionally state that Plaintiff was able to file numerous papers in the instant case through use of the institutional mail system.[7]

In opposition Plaintiff states with regard to his inability to name individual correctional officers who have confiscated his mail that he cannot "babysit" officers and that Defendants have access to surveillance video to verify who is responsible for the conduct alleged. ECF No. 53 at p. 2. Plaintiff takes issue with Defendants' assertion that he has no constitutional right to file a

---

[7] Outside of the initial three pleadings, Plaintiff filed 23 additional pleadings and correspondence in the instant case.

grievance given the requirements of the PLRA that administrative remedies must be exhausted before this court may consider a constitutional claim. *Id*. With regard to the number of appeals that reached the Commissioner's office, Plaintiff states that the appeals that reached the intended destination were re-routed through his mother who forwarded the appeals for him. *Id*. at Ex. B, *see also* ECF No. 55 (declaration of Teresa Fabula).

The Prison Litigation Reform Act ["PLRA"] requires a prisoner to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Thus, the exhaustion provision plainly extends to the allegations raised by Plaintiff and, upon proof that he has failed to exhaust a claim, Defendants are entitled to dismissal of the unexhausted claims. *See Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674, 681 (4th Cir. 2005). Plaintiff's claim that he is denied access to the appeal process for his ARPs is a claim that he is denied access to courts. The tools required by *Bounds v. Smith*, 430 U. S. 817, 821 (1977) "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U. S. 343, 355 (1996). Impairment of other capacities to litigate are consequential to incarceration and are constitutional. *Id*.

Defendants have asserted that Plaintiff has failed properly to exhaust administrative remedies with respect to his medical claim and his claim that mail is mishandled. Plaintiff does not dispute his failure to exhaust administrative remedies; rather, he insists the failure is the fault of prison officials who are not processing his complaints appropriately. Assuming Plaintiff's assertion is correct, he has failed to show that the mishandling of his ARP appeals has resulted in an actual injury with regard to the mishandling of his mail. There has been no impairment of his ability to litigate the instant case and he has pointed to no meritorious claim which was dismissed as a result of the alleged confiscation of his mail. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *See Lewis v. Casey*, 518 U. S. 343, 352-352 (1996). The absence of an actual injury defeats Plaintiff's claim regarding mishandling of his ARP appeals. Defendants are entitled to summary judgment in their favor on this claim.

A separate Order follows.

Date: __September 20, 2013__          _____/s/_____
                                      DEBORAH K. CHASANOW
                                      United States District Judge